IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY WARNICK and TAMARA WARNICK, | ) ) |
| | ) No. 2:05-CV-1394 |
| Plaintiffs, | ) |
| | ) |
| v. | ) Judge Thomas M. Hardiman |
| | ) |
| NMC-WOLLARD, INC. and HOBART BROTHERS COMPANY, | ) ) |
| | ) |
| Defendants. | ) |
| | ) |

## OPINION

### I.    Introduction

Plaintiff Gary Warnick (Warnick) brought this negligence and product liability action

against Defendants NMC-Wollard, Inc. (NMC) and Hobart Brothers Company (Hobart) after he

permanently injured his right thumb while working as a baggage handler at Greater Pittsburgh

International Airport. Warnick's wife, Tamara, has sued for loss of consortium. Both NMC and

Hobart filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil

Procedure and oral argument was heard on January 5, 2007. For the reasons that follow, the

Court finds that Defendants are entitled to judgment as a matter of law for two independent

reasons.

### II.    Procedural History

Plaintiffs initiated the case by filing a Complaint in the Philadelphia County Court of

Common Pleas. On May 5, 2005, Hobart removed the action to the United States District Court

for the Eastern District of Pennsylvania, invoking diversity jurisdiction under 28 U.S.C. §1332.

On May 12, 2005, Hobart answered the complaint and asserted cross-claims against NMC. On

June 14, 2005, NMC answered, denying all wrongdoing. On October 7, 2005, the case was

transferred to this Court pursuant to 28 U.S.C. §1404(a) because the injury occurred in this

judicial district.

## III.    Facts

At the time of his injury, Plaintiff Warnick had been employed by US Airways as a

baggage handler for almost twenty years. In this capacity, Warnick worked with belt loaders,

which are industrial products operated by airline ground personnel. As anyone who has peered

out of an airplane window while on the tarmac has noticed, belt loaders are used to transfer

baggage to and from the cargo holds of aircraft by means of a mechanized conveyor belt. Belt

loaders virtually identical to the product at issue in this case have been sold and used all over the

world for decades.

On April 11, 2003, while working at the Greater Pittsburgh International Airport,

Warnick attempted to step up from the ground onto the running board of a belt loader when he

fell and implanted his right thumb into the metal grate of the running board (known as "grip-

strut"). Warnick suffered a hyperextension sprain of his right thumb, which required surgical

repair of the collateral metacarpopohalangeal joint and the insertion of hardware. Other than a

twisted right knee in 2001, Warnick had never been injured in twenty years of working with belt

loaders on a daily basis.

2

Warnick claims that the belt loader was defectively designed because it required users to negotiate an unnecessarily high step without the benefit of handrails. Significantly, however, Warnick does not identify the belt loader upon which he was injured by serial number or year of manufacture. During his deposition, Warnick eventually identified the *type* of belt loader and the fact that it contained an oval plate near the steering wheel that bore the name "Wollard."[1] The Wollard name has long been associated with belt loaders, having been manufactured by various companies at different times. Criton, Hobart, Steingart, and NMC - either themselves or through related companies - have produced belt loaders that bear the Wollard name. In light of Plaintiffs' claims and Defendants' cross-claims, there remains some disagreement among the parties regarding both the corporate structures of Hobart and NMC and their involvement in the manufacture of belt loaders. For purposes of this Opinion, which addresses Defendants' motions for summary judgment, the Court accepts as true Plaintiffs' claims that both Hobart and NMC manufactured the model 886 belt loader, which is the model that Plaintiff Warnick ultimately testified he was injured upon at work on April 11, 2003.[2]

---

[1]     Warnick's initial testimony was equivocal regarding the model of belt loader upon which he was injured. In his August 2005 deposition, Warnick viewed photos of both the 886 and 888 model belt loaders and testified that the belt loader at issue had a running board that was about 27 inches high, which Warnick believed was higher than that depicted on those two models. On March 6, 2006, Warnick was re-deposed on product identification and shown photos of an older, model 885 belt loader. This time, he testified that the belt loader he was using on April 11, 2003 resembled a model 886.

[2]     Defendant NMC claims that in November 1994 it began manufacturing TC-888 model belt loaders and it never manufactured the 886 model. Because both Defendants are entitled to judgment as a matter of law on two independent grounds, the Court does not address this issue.

3

From 1983 until 1987, Wollard Airport Equipment Company (WAEC) developed and sold the TC-886 model belt loader. At that time, WAEC was operated as a division of Heath Techna and/or Criton Technologies. In 1987, Criton transferred WAEC's assets and liabilities to Defendant Hobart, which incorporated WAEC in Ohio for the purpose of acquiring the WAEC division of Criton.[3] At the time of this acquisition, WAEC was located in Florida and manufactured lavatory trucks, portable aircraft stairways, and belt loaders. Seven years later, on October 21, 1994, Hobart sold the assets of WAEC to Wollard Airport Equipment Company, Inc. (WAEC Inc.), which is a predecessor-in-interest to Defendant NMC.

Plaintiffs submitted the expert report of Daniel Pacheco, P.E., who opined that the belt loader upon which Warnick was injured was the product of an "unreasonably dangerous" design. According to Pacheco, the belt loader was defective because it was technologically and economically feasible for the model 886 to have a lower running board and/or handrails. In rebuttal, however, Hobart submitted the deposition testimony of Mr. Peter Driver, a WAEC engineer. Driver testified that because belt loaders interface with other equipment on the tarmac, and because all airport equipment bears "rub rails" at a height of eighteen inches from the tarmac, the running boards on the loaders could not be lower than the height of the rub-rails:

---

[3]     Hobart is an Ohio corporation formed in 1917. Before it expanded its business through the 1987 acquisition of WAEC, Hobart manufactured welders, welding consumables, and aircraft generators at two plants in Ohio.

*i.e.*, eighteen inches from the ground.[4]  Driver further testified that adding steps to the belt loaders would not be feasible, as these design features would create tripping hazards.[5]

Finally, Plaintiffs note in support of their collateral estoppel argument that Hobart sought summary judgment in separate state court cases involving belt loaders on two prior occasions in *Andrews v. Hobart, et al.*, October Term, 2003, No. 1655 and *Slobodjian, et al., v. Hobart, et al.*, January Term 2004, No. 1956.  On February 22, 2006, those Motions were denied summarily by the Honorable Victor DeNubile in a one page Order devoid of reasoning or analysis.

## IV.  Standard of Review

Summary judgment must be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  The moving party carries the initial burden of demonstrating an absence of a genuine issue of material fact.  *See* Fed. R. Civ. P. 56; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Facts, inferences

---

[4]  The evidence establishes that the total height of the running board on the model 886 loader is twenty to twenty-one inches, depending upon whether a grip-strut surface is attached.

[5]  As to the feasibility of handrails, Mr. Paul L. Dreyer, P.E., a consultant hired by NMC to evaluate Mr. Pacheco's report and to render an opinion regarding the safety of the model 886 loader, opined that steps could not safely be added to belt loaders without "an accompanying hand hold point," and added that — because a hand hold could impede the movement of the baggage on the belt — "a suitable location for a hand hold is not practical."  For this reason, Mr. Dreyer ultimately opined that "an additional step may not be safe or feasible."

5

therefrom, and ambiguities must be viewed in the light most favorable to the nonmovant. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

When the moving party has met its burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 587. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *See Liberty Lobby, Inc.,* 477 U.S. at 248-49; *see also Matsushita Elec. Indus. Co.,* 475 U.S. at 587. Thus, a nonmoving party "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue." *Podobnik v. U.S. Postal Service,* 409 F.3d 584, 594 (3d Cir. 2005) (internal quotation marks omitted) (quoting *Celotex*).

## V. Jurisdiction

Defendants invoke this Court's diversity jurisdiction pursuant to 28 U.S.C. §1332. Although Plaintiffs have not challenged Defendants' assertion of this basis of subject matter jurisdiction, "federal courts have the duty . . . where the issue of jurisdiction is not raised by any party, to inquire into their jurisdiction to act and to deny relief where jurisdiction is lacking." *See Pharmadyne Laboratories, Inc. v. Kennedy,* 596 F.2d 568, 570 n.3 (3d Cir. 1979) (citations omitted). The pleadings in this case demonstrate that diversity exists.

As jurisdiction is based on diversity of citizenship, the Court must apply the choice of law rules of the forum state, Pennsylvania. *See Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496-97 (1941). The parties and the Court are in agreement that Pennsylvania law governs

6

this action. *See Petrucelli v. Bohringer & Ratzinger*, 46 F.3d 1298, 1308 (3d Cir. 1995); *see also Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).

## VI.   Analysis

Defendants advance two independent bases for summary judgment. First, they argue that the belt loaders they manufactured are not unreasonably dangerous as a matter of law. Second, Defendants claim that Plaintiffs cannot prove an essential element of their claim, causation, because they cannot identify the manufacturer of the particular belt loader that caused Warnick's injury. Plaintiffs disagree, insisting that their expert is prepared to testify that belt loaders are unreasonably dangerous, and arguing that — if their "circumstantial evidence" of the identity of the manufacturer of the belt loader that injured Warnick is insufficient — the burden of proving causation should be shifted to Defendants via the doctrine of alternative liability. Under Pennsylvania law, a plaintiff alleging strict product liability ultimately must show that the product was defective, that the defect proximately caused the plaintiff's injury, and that the defect existed at the time the product left the defendant's control. *See Pavlik v. Lane Ltd./Tobacco Exporters Int'l,* 135 F.3d 876, 881 (3d Cir. 1998) (citing Rest. (Second) of Torts §402A). Although causation is an element of Plaintiffs' *prima facie* case common to all of their tort claims,[6] "[t]he threshold inquiry in all products liability cases is whether there is a defect."

---

[6]   Plaintiffs also must prove that Defendants' product caused Warnick's injury in connection with their negligence claim in Count II, and in furtherance of Tamara's loss of consortium claim in Count III. *See Pappas v. Sony Electronics, Inc.*, 136 F. Supp.2d 413, 428 (W.D. Pa. 2000) (applying Pennsylvania law for the proposition that "[t]o sustain a product liability claim based on negligence, a plaintiff must prove that the product was defective, that the defect proximately caused an injury, and that the defendant failed to exercise due care in designing or manufacturing the product."); *see*

*Riley v. Warren Manufacturing, Inc.,* 688 A.2d 221, 224 (Pa. Super. 1997). This is true whether a plaintiff's claims sound in negligence or strict liability. *See Pullins v. Stihl Inc.*, No. Civ. 03-5343, 2006 WL 1390586, at \*5 (E.D. Pa. May 19, 2006) (citation omitted).

Before reaching the merits of Plaintiffs' claims, the Court must consider whether Hobart is collaterally estopped from challenging their claims because the Philadelphia Court of Common Pleas denied Hobart's motions for summary judgment in two separate cases in which different plaintiffs asserted design-defect claims based on belt loader-related injuries. Issue preclusion applies when: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from re-litigating the issue was fully represented in the prior action." *Dam Things From Denmark v. Russ Berrie & Co., Inc.,* 290 F.3d 548, 559 n.15 (3d Cir. 2002) (internal quotations omitted). Applying these criteria, it is plain that Hobart is not collaterally estopped from raising its defenses.

As a threshold matter, the Court observes that interlocutory orders issued by Pennsylvania courts are not final and are not given res judicata or collateral estoppel effect. *See Creighan v. City of Pittsburgh,* 389 Pa. 569, 132 A.2d 867, 870 (1957). Denials of summary judgment ordinarily fall into the category of interlocutory rulings. *See Melvin v. Doe,* 575 Pa. 264, 268, 836 A.2d 42, 44 (2003); *see also Bines v. Kulaylat,* 215 F.3d 381, 384 (3d Cir. 2000) (noting that the denial of a motion for summary judgment is an interlocutory order). As the Third Circuit has

---

*also Urmann v. Rockwood Cas. Ins. Co.*, 905 A.2d 513, 522 (Pa. Super. 2006)
(explaining that a loss of consortium claim is derivative of the injured spouse's direct
tort claims, and that "deficiencies in the physically-injured spouse's evidence in a tort
action apply with equal vigor to the other spouse's loss of consortium claims.").

8

noted, however, the concept of finality for purposes of "collateral estoppel does not require the entry of a judgment final in the sense of being appealable"; instead, "the doctrine of collateral estoppel applies whenever an action is sufficiently firm to be accorded conclusive effect." *In re Brown,* 951 F.2d 564, 569 (3d Cir. 1991) (internal quotation marks omitted).

Even if denials of summary judgment were sufficiently final to be given conclusive effect, the orders in question are summary denials devoid of any explanation or reasoning. The Pennsylvania Supreme Court "has previously explained that an order entered without an opinion or other explanation cannot provide justification for invoking the doctrine of collateral estoppel." *Krosnowski v. Ward,* 836 A.2d 143, 148 (Pa. Super. 2003) (citing *Safeguard Mutual Insurance Co. v. Williams,* 345 A.2d 664, 669-70 (Pa. 1975)); *see also Delmont Mechanical Services, Inc. v. Kenver Corp.*, 677 A.2d 1241, 1244 n.3 (Pa. Super. 1996) (declining to give preclusive effect to the Court of Common Pleas' denial of a summary judgment motion, where such denial "was without opinion"). The lack of explanation from the Court of Common Pleas makes it impossible for this Court to know which arguments the court rejected, which it accepted, and which it simply failed to reach. Thus, the Court cannot ascertain which ground was "necessary to the decision." *See Dam Things*, 290 F.3d at 559 n.15. Additionally, although Hobart raised the same legal issue in the state court actions — *i.e.*, plaintiffs' inability to identify the maker of the product that allegedly injured them — the factual issues involved in those defenses are different because the circumstances in which those other plaintiffs' injuries occurred necessarily differ from case to case.

Because Plaintiffs have not satisfied all four of the criteria necessary for the application of collateral estoppel, the Court declines to give preclusive effect to the Court of Common Pleas'

9

denials of summary judgment in the other cases and will resolve Plaintiffs' claims against all of

the Defendants on their merits. *See Cohen v. W.C.A.B. (City of Philadelphia)*, 909 A.2d 1261,

1264 (Pa. 2006); *accord Gregory v. Chehi,* 843 F.2d 111, 121 (3d Cir. 1988).

## 1.    Defendants Have Met Their Burden Of Proving That Their Belt Loaders Are Not "Unreasonably Dangerous" As A Matter Of Law

Defendants insist that they are entitled to summary judgment because their belt loaders

are not "unreasonably dangerous." In support of this claim, Defendants offer the deposition

testimony of Peter Driver, a WAEC engineer. Plaintiffs note that their expert is prepared to

testify to the contrary.

> 'The court determines unreasonable dangerousness using a risk-
> utility analysis.' *Monahan v. Toro Co.* 856 F.Supp. 955, 958 (E.D.
> Pa. 1994) (applying Pennsylvania law). 'In a defective design case,
> the question is whether the product should have been designed
> more safely for its intended use,' *see Putt v. Yates-American Mach.
> Co.,* 722 A.2d 217, 221 (Pa. Super. 1998) (citation omitted); it is
> that question which the risk-utility analysis attempts to answer.
> Under this analysis, the burden of establishing that the product is
> not unreasonably dangerous lies with the defendants, and the
> evidence on this threshold issue must be viewed in the light most
> favorable to the plaintiff.

*See Surace v. Caterpillar, Inc.,* 111 F.3d 1039, 1049 n.10 (3d Cir. 1997) (citation omitted). In

determining whether Defendants have discharged that duty, this Court must determine "whether

the evidence is sufficient, for purposes of the threshold risk-utility analysis, to conclude as a

matter of law that the product was not unreasonably dangerous, not whether the evidence creates

a material fact for the jury." *Id.* (applying Pennsylvania law). Thus, this Court must, in

appropriate cases, reject design defect claims as a matter of law, even where the plaintiff presents

evidence tending to show that the product is defective. *See, e.g.*, *Riley,* 688 A.2d at 225-226

10

(affirming directed verdict in favor of manufacturer of bulk-feed trailer even though plaintiff presented eight alternative designs and expert testimony that trailer was defective because it lacked a guard on the discharge tube); *see also Fitzpatrick v. Madonna,* 623 A.2d 322, 326 (Pa. Super. 1993) (granting JNOV on appeal in favor of manufacturer of outboard motor even though plaintiff presented expert testimony that motor was defective for failing to encase propeller in a shield); *Jordon v. K-Mart Corp.,* 611 A.2d 1328, 1331 (Pa. Super. 1992) (affirming summary judgment in favor of seller of plastic toboggan, even though plaintiffs were prepared to present expert evidence that product was defective because it had "molded runners that rendered the sled unsteerable" and because it "lacked independent steering or braking mechanisms.").

As the foregoing authorities indicate, this Court may resolve the question whether Defendants' belt loaders are "unreasonably dangerous" on summary judgment. *See Childers v. Joseph,* 842 F.2d 689, 696 n.7 (3d Cir. 1988). Pennsylvania courts have identified several factors relevant to this inquiry:

> (1) the usefulness and desirability of the product — its utility to the user and to the public as a whole; (2) the safety aspects of the product — the likelihood that it will cause injury, and the probable seriousness of the injury; (3) the availability of a substitute product which would meet the same need and not be as unsafe; (4) the manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility; (5) the user's ability to avoid danger by the exercise of care in the use of the product; (6) the user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or the existence of suitable warnings or instructions; and (7) the feasibility, on the part of the manufacturer, of spreading the loss of setting the price of the product or carrying liability insurance.

*See Surace,* 111 F.3d at 1048 (quoting *Dambacher by Dambacher v. Mallis,* 485 A.2d 408, 423

11

n.5 (Pa. Super. 1984)) (quoting in turn John W. Wade, *On the Nature of Strict Tort Liability-Products*, 44 Miss. L.J. 825, 837-38 (1973)). In the course of weighing the so-called Wade

factors, the Court must keep in mind the purpose of the product. As the Pennsylvania Superior

Court has explained:

> Determining the product's intended purpose is critical to the court's
> legal conclusions about whether the product can be deemed defective.
> The court will necessarily make different conclusions about the risk-utility of a product depending on whether the court construes the
> intended purpose of a product broadly or narrowly. If the trial court is
> properly to discharge its duty as a social philosopher and a risk-utility
> economic analyst, the court must be afforded some measure of latitude
> to determine the intended purpose of a product. It follows that the
> intended use of a product is a conclusion of law, to be decided by the
> trial court. In other words, the trial court is not bound by any party's
> legal conclusions as to the intended purpose of a product, even if those
> conclusions are couched as averments of fact or presented as expert
> evidence. To hold otherwise would force trial courts (and reviewing
> courts) to accept unrealistic, generalized, or distorted views of a
> product's purpose simply because they are presented as factual
> evidence.

*Schindler v. Sofamor, Inc.*, 774 A.2d 765, 773 (Pa. Super. 2001) (citations and footnotes

omitted).[7] Reviewing the record in this case in the light most favorable to Plaintiffs, as the Court

must at the risk-utility stage of the analysis, *see Surace*, 111 F.3d at 1049 n.10; *see also Burch v.

Sears, Roebuck & Co.,* 467 A.2d 615, 618-19 (Pa. Super. 1983), it is clear that the aircraft belt

loaders at issue are not unreasonably dangerous as a matter of law.

First, it is beyond cavil that belt loaders are useful machines. Hobart persuasively

explains how belt loaders are indispensable:

---

7

> As *Monahan* explained: "The burden of proof as to these seven factors is on the
> defendant, although the ultimate burden of proving a defective product at trial is,
> of course, on the plaintiff." *Monahan*, 856 F. Supp. at 958 (citation omitted).

12

> [B]elt loaders are used in the airline industry by personnel like
> [Warnick] to convey luggage from the ground to airplane cargo
> holds, and vice versa. Since [Warnick] had been employed at U.S.
> Air in 1984, he had been using a belt loader to perform his job.
> The belt loader at issue essentially is a mobile conveyor belt. It is
> similar to a small car with a steering wheel and a conveyor belt that
> runs along the right side of the vehicle, extending beyond the front
> and rear. The operator takes the loader to the cargo door of an
> airplane and raises the conveyor belt up to the hold. Then, luggage
> is either transported to, or from, the hold by way of the conveyor
> belt. Based on [Warnick's] testimony alone, it is readily apparent
> that these products have been a ubiquitous and necessary part of
> the commercial airline industry for at least 20 years.

Hobart Mot. at 14 (citation to record omitted)). Plaintiffs concede that "the belt loader is useful

to the public as a whole." (Pl. Opp. to Hobart Mot. at 24).

The second Wade factor — which gauges the likelihood and severity of injury under the

existing design — also weighs in favor of Defendants. Although Plaintiffs make no argument

regarding the probable severity of any injury that would be suffered on the belt loaders as they

were designed at the time of Warnick's accident, they do insist that all belt loaders bearing the

Wollard emblem are likely to cause injury because the height of the fenders bearing the grip-strut

surface — when combined with the lack of handrails or steps — would increase the likelihood of

the user losing his balance when climbing on or off the loader. The mere fact that a product may

cause injury does not, however, lead to the conclusion that it is "unreasonably dangerous" as a

matter of law. *See Monahan,* 856 F. Supp. at 958. Defendants emphasize that the peculiar injury

Plaintiff suffered was a freak accident and not a "likely" result of using this machine, and the fact

that Warnick suffered only two belt loader-related injuries — the previous of which was minor

— in his 20 years on the job, cuts against Plaintiffs' argument that Wollard belt loaders are likely

to cause injury. The Court is persuaded that Warnick's ability to use this product virtually

13

accident-free for two decades, when coupled with the nature of the injuries that he did sustain,

tips the scale in Defendants' favor on the second factor.[8]

The third Wade factor, which considers the availability of safer substitutes, also weighs in

favor of finding Defendants' aircraft belt loaders not unreasonably dangerous. On this point,

Plaintiffs contend that two design changes will eliminate the risk that users of the loaders will

lose their balance and fall:

> [T]he design of a Wollard belt loader did not have intermediate
> steps to step onto and/or off the running board and there was no bar
> or handhold device in order to stabilize ramp agents having to do
> this work as they went onto or off of the belt loader. Additional
> steps and/or a hand bar would have been easy to design and would
> have prevented [Warnick's] injuries. Moreover, the addition of
> more steps to reduce [*sic*] or a hand rail would have eliminated
> the unsafe character of the product without impairing its
> usefulness. [¶] Defendants knew what their equipment would be
> used for, and specifically marketed and designed the product for
> the airline industry. Defendants could have and should have
> incorporated these minimum changes in the design to make the
> product safe, as pointed out by Plaintiffs' experts. Failing to do so
> in light of the environment [in which] the product was to be used
> made the product unreasonably dangerous.

(Pl. Opp. to Hobart Mot. at 25; *see also* Pl. Opp. to NMC Mot. at 20). Plaintiffs' argument does,

indeed, represent the gist of what their expert opines. Defendants argue, however, that these

proposed changes would, if anything, make belt loaders *more* dangerous — because adding steps

---

[8]     *See Van Buskirk ex rel. Van Buskirk v. West Bend Co.*, 100 F. Supp.2d 281, 286 (E.D. Pa.
1999) (noting that the "relatively low number of reported consumer accidents" associated
with deep fryers weighed in favor of defendants on the second factor)); *see also Shetterly
v. Crown Controls Corp.*, 719 F. Supp. 385, 400 (W.D. Pa. 1989) (finding that the
second factor weighed in favor of the defendant manufacturer of pallet trucks in light of
"the relative chances that the product will cause injury compared to the many work years
of injury free use [and] [...] the fact that the injuries sustained are not life threatening."),
*aff'd,* 898 F.2d 142 (3d Cir. 1990)).

to the loader would create new tripping hazards for users, as Mr. Driver testified, and because, even if steps could be added, they could not be added safely without the addition of handholds: a design feature which would be impractical insofar as handholds would tend to interfere with the progress of cargo on the belt, as Mr. Dreyer observed.

Whether a proposed design change will make a product safer in some ways but more hazardous overall is a proper inquiry.[9] Plaintiffs point to no evidence to refute Defendants' contention that the proposed design changes would actually make the belt loaders more dangerous; indeed, their expert makes no mention of this possibility. That being so, the evidence indicates that Defendants' loaders might be in some ways more safe, and in some ways, less safe, if they were to incorporate the handrail and step features that Plaintiffs' expert has recommended. But even assuming that the overall effect of these design additions would be to make the belt loaders safer, the mere allegation that a safer design exists — without proof that the original design was unreasonably dangerous — does not constitute a design defect because liability is not imposed on a manufacturer for failing to make an already safe product somewhat safer. *See Pascale v. Hechinger Co.*, 627 A.2d 750, 753 (Pa. Super. 1993).[10]

---

[9] *See Phatak v. United Chair Co.,* 756 A.2d 690, 695 (Pa. Super. 2000) (noting that the court may consider "the adverse consequences to the product and to the consumer that would result from a safer design," and explaining that whether a "safer" chair design would actually make the product more dangerous because of a tripping hazard it created is relevant because, in that circumstance, "the risk-utility is essentially negative.").

[10] Plaintiffs have made no effort to refute Defendants' contentions that the features used on their belt loaders are "typical in the industry." "The failure of an expert to address the issue of industry practice undermines testimony concerning alternative design." *Willis v. Besam Automated Entrance Systems, Inc.*, No. 04-CV-913, 2005 WL 2902494, at *8 (E.D. Pa. Nov. 3, 2005) (citing *Milanowicz v. Raymond Corp.,* 148 F. Supp.2d 525, 5353 (D. N.J. 2001)).

15

The Court also finds that the fourth Wade factor weighs in Defendants' favor.

Defendants note, without evidence to the contrary from Plaintiffs, that studding the loaders with additional steps and handrails would create tripping hazards. Where, as here, proposed design changes could make a product more dangerous, the inquiry into the safety of the proposed new design relates to the feasibility of that design. *See Phatak*, 756 A.2d at 695 (noting that "[i]f, as [the defendant] contended, extending the outriggers [on a chair] would have created an "unbelievable tripping hazard" to others, its overall usefulness, desirability and utility would be adversely affected.") (internal quotation marks omitted). Additionally, Defendants maintain that lowering the running board is not feasible because "it would expose more of the unit's operating surfaces to damage by other ground support equipment." (NMC Mot. at 9). Although Plaintiffs insist that handrails and steps could be added to the Wollard belt loader and that the running board could be lowered without impairing its usefulness, this allegation is conclusory; nowhere does Plaintiffs' expert so opine. Indeed, although Plaintiffs' expert acknowledged Mr. Driver's testimony that the loader's sides needed to be a certain height "to provide protection of the loader from other vehicles or objects it might come in contact with," he summarily rejected that evidence because it did not identify "the origin of that requirement."[11] (Pl. Opp. to NMC Mot., Exh. 8, at 3). Nor does Plaintiffs' expert address Mr. Driver's testimony that additional steps would be more dangerous because of the tripping hazards those features would entail, or Mr. Dreyer's opinion that steps could not be added safely without handholds — which would

---

[11] An expert may not disregard evidence that contradicts his opinion simply because he views it as lacking in foundation or less than fully credible. *See United States v. Ward,* 169 F.2d 460, 462 (3d Cir. 1948) ("The 'expert' may not go so far as to usurp the exclusive function of the [finder of fact] to weigh the evidence and determine credibility.").

16

interfere with the proper function of the belt itself. Because Defendants' assertions about the functional and safety-related reasons for the height of the belt loaders and the absence of additional steps and handholds are uncontradicted by any evidence of record, the Court concludes that the fourth factor weighs in Defendants' favor. *See Riley*, 688 A.2d at 226 (finding that the fourth factor favored defendants where the plaintiff's expert opinion did not account for "the total use of the product, nor the effect his suggestions would have on the utility of the bulk feed trailer").[12]

The fifth and sixth Wade factors, which assess an ordinary user's ability to avoid danger by the exercise of care and his anticipated awareness of the inherent dangers of the product, each cut decisively in favor of Defendants. Specifically, the Court finds that an ordinary user of these belt loaders could, by the exercise of care in stepping on and off the equipment, avoid losing his balance — a problem that Warnick avoided for nearly all of the 20 years he had worked with belt loaders on a daily basis.[13] *See Jordon*, 611 A.2d at 1331-32 (finding that the dangers of a plastic sled would have been avoidable and obvious to a 10 year-old boy, who admitted he had used the same sled on seven sledding runs without incident before injuring himself on the eighth run).

---

[12]   Mr. Pacheco's opinion is striking in that it contains several sweeping, conclusory statements. For example, Pacheco refuses to accept that Warnick's use of belt loaders for nearly two decades without significant injury bears any relevance to the safety of the design. Additionally, Pacheco rejected Mr. Dreyer's observation that the height of the belt loader's running board is dictated in part by interface requirements, criticizing Dreyer for "justifying the unsafe Wollard design by comparing it to equally unsafe designs of belts loaders and other airport ramp equipment." To the extent Pacheco appears to opine that Warnick was simply lucky in using belt loaders for nearly 20 years without incident, and that *all* airport equipment bearing the eighteen inch rub rail is unreasonably dangerous, his opinion is speculative and wholly lacking in foundation.

[13]   Although NMC insists that Plaintiffs are barred from recovery by Warnick's assumption of risk, the Court declines to so hold. *See Surace*, 111 F.3d at 1050 (plaintiff's failure to exercise care irrelevant to unreasonably dangerous analysis).

17

And where, as here, it is "common knowledge" that a person who loses his balance while stepping onto or off of the running board of a vehicle can sustain a hand injury while trying to break his fall, the Court finds that the risk of falling on the loader could be both anticipated and avoided. *See Shetterly*, 719 F. Supp. at 385 (concluding that, where it is "common knowledge" that a vehicle can cause injury, the sixth Wade factor weighed in favor of the defendant).

Finally, the Court finds that the seventh factor — which concerns whether the manufacturer feasibly could spread the loss, either through a price adjustment or insurance — is either immaterial, or weighs in Defendants' favor. "[W]hen consideration of the preceding six factors leads to the conclusion that the utility of [sic] product in question outweighs its risks, such determination compels the further conclusion that shifting the cost of plaintiff's loss to the manufacturer of the product is not fair, and, therefore, not feasible." *Riley v. Becton Dickinson Vascular Access, Inc.,* 913 F. Supp. 879, 890 (E.D. Pa. 1995). As the analysis of the first six Wade factors demonstrates, Defendants' belt loaders are not "unreasonably dangerous" as a matter of law. Accordingly, this seventh factor weighs in Defendants' favor, assuming that it is not a foregone conclusion.[14] *See id.*

In sum, even accepting the opinion offered by Plaintiffs' expert, the Court concludes that the Wade factors weigh overwhelmingly in favor of finding that the design of Defendants' cargo belt loaders is not, as a matter of law, "unreasonably dangerous" by dint of the height of their

---

[14]     *See Hittle v. Scripto-Tokai Corp.,* 166 F. Supp.2d 159, 162 (M.D. Pa. 2001) (citing *Azzarello v. Black Bros. Co.,* 391 A.2d 1420, 1433 (Pa. 1978) for the proposition that "a judicial determination that Pennsylvania's social policy does not support placing the risk of loss on the manufacturer in a strict products liability case is the equivalent of a judicial conclusion that the product is not defective under strict products liability law.") (alterations and ellipses omitted).

profile and their lack of side handrails or steps. For all intents and purposes, this ends the
inquiry into Plaintiffs' strict liability claims: "If the Court concludes that the defendant has met
its burden [at the risk-utility stage], summary judgment for the defendant is appropriate." *See*
*Bowersfield v. Suzuki Motor Corp.,* 111 F. Supp.2d 612, 617 (E.D. Pa. 2000).

### 2. Plaintiffs Cannot Show Causation As To Count I (Strict Products Liability) And Count II (Negligence) Because Of Their Inability To Identify The Manufacturer Of The Belt Loader At Issue

As explained above, the Court finds that Defendants have proved that their belt loaders
are not defectively designed. Moreover, a defendant's burden of proof at the risk-analysis
inquiry is analytically distinct from, and independent of, a plaintiff's burden of proving the
remaining elements of a design defect claim, including causation. *See Forrest v. Beloit Corp.*,
424 F.3d 344, 353 (3d Cir. 2005). Thus, the Court's finding that Defendants' belt loader design
is not unreasonably dangerous as a matter of law obviates the need for it to determine whether
Plaintiffs have met their burden of proving the other elements of their *prima facie* case.[15]

But even if the Court were to find that Defendants had not met their burden of proof at
the risk-utility stage, Plaintiffs still could not proceed to trial on their tort claims unless they
could create a triable issue of material fact that a particular Defendant's loader actually caused
their injuries. "Under Pennsylvania law, the burden of proving [an] 'unreasonably dangerous'

---

[15]     *See, e.g.*, *Thomas v. ABX Air, Inc.,* 290 F. Supp.2d 532, 537 n.2 (E.D. Pa. 2003)
(explaining that a ruling against the plaintiff on one element of a strict products liability
claim obviated the need to reach the other elements of the claim); *see also Gower,* 166 F.
Supp.2d at 250 (observing that "[b]ecause this design defect claim fails the causation
prong of 402A, the Court need not decide whether it satisfies the other elements of a
design defect claim under 402A"); *Stitt v. Philip Morris, Inc.,* 245 F. Supp.2d 686, 692
(W.D. Pa. 2002) ("The fact that a product is alleged to have caused an injury, [. . .] does
not, by itself, establish a defect because a manufacturer is not an insurer of all injuries its
products cause.") (citing *Azzarello,* 391 A.2d at 1024).

19

[product] is met by proving *both a defective condition and causation.*" *See Parkinson v. Guidant Corp.*, 315 F. Supp.2d 741, 746 n.5 (W.D. Pa. 2004) (emphasis added) (citing *Walton v. Avco Corp.,* 530 Pa. 568, 610 A.2d 454, 458 (1992)).[16] Thus, assuming *arguendo* that aircraft belt loaders of the type sold or made by Defendants are unreasonably dangerous as a matter of law, "then the distinct question of whether the defect proximately caused the injury must be resolved." *Surace*, 111 F.3d at 1053 (citing *Pacheco v. Coats Co.,* 26 F.3d 418, 422 (3d Cir.1994)).

In this case, there is no dispute that Plaintiffs failed to retain the belt loader at issue for identification. The parties vehemently disagree, however, as to whether Warnick's recollections of the markings on the loader at issue are sufficiently detailed to tie that loader to a particular Defendant. Warnick testified at his deposition that the belt loader bore the name "Wollard" on an oval plate near the steering wheel, and that its running-board was approximately 27" with a grip-strut surface and squared fenders. Although Warnick initially testified that *neither* the 886 nor the 888 models resembled the belt loader in question, he later testified that the loader resembled the 886 model — even though the running board of the 886 model stands about 21" (and not 27") above the ground.

In their characterization of this evidence as "circumstantial," Plaintiffs appear to concede that they have no direct evidence as to which Defendant manufactured the product that actually caused Warnick's injury. Nevertheless, on the theory that the 886 and 888 models "are the only two possible models that could have caused [Warnick's] injuries," Plaintiffs ask the Court to

---

[16]     Although Defendants bear the burden of proving that their products are not "unreasonably dangerous" at the risk-utility stage of the analysis, Plaintiffs bear the burden of showing "that the alleged injuries were proximately caused by the product's design." *See Shetterly,* 719 F. Supp. at 388.

permit a jury to determine "whether [Warnick was] injured on a belt loader manufactured by Hobart-Wollard or NMC-Wollard." (Pl. Opp. to NMC Mot. at 13). The Court declines to do so.

Pennsylvania law requires that a "plaintiff must establish that the injuries sustained were *caused by* the product of *a particular manufacturer or supplier*." *Payton v. Pennsylvania Sling Co.,* 710 A.2d 1221, 1225-1226 (Pa. Super. 1998) (emphasis added) (citing *Burman v. Golay and Co., Inc.,* 616 A.2d 657, 659 (Pa. Super. 1992)). Although preservation of the allegedly defective product usually is not required in design defect cases,[17] sometimes retention of "the product is necessary because the plaintiff is unable to prove a *prima facie* case absent proof of the identity of the seller or the manufacturer." *See O'Donnell v. Big Yank, Inc.,* 696 A.2d 846, 849 (Pa. Super. 1997). Because proof of causation is an essential element of the torts Plaintiffs allege here, their failure to adduce sufficient evidence of causation would doom all three of their claims.

Plaintiffs correctly note that the identity of the manufacturer sometimes can be proved by circumstantial evidence. Indeed, Pennsylvania courts have recognized that "in cases in which the allegedly defective product is not available, a plaintiff may prove identification through circumstantial evidence." *Payton*, 710 A.2d at 1224 (citing *O'Donnell,* 696 A.2d at 849). The quantum of identification evidence a plaintiff must offer prior to trial to justify allowing the issue to be submitted to a jury is case-specific; if the identification evidence of the product or its manufacturer is questionable, the claim should not be submitted to a jury. *See id.* at 1224-26; *see also Burman v. Golay and Co.*, 616 A.2d 657, 659 (Pa. Super. 1992). But the circumstantial evidence Plaintiffs have presented — which consists of Warnick's testimony that he was injured

---

[17]     *See Schmid v. Milwaukee Elec. Tool Corp.,* 13 F.3d 76, 79-80 (3d Cir. 1994) (explaining that defendants usually are not prejudiced by destruction or loss of evidence in design defect cases because they can test other products of same design).

while using a belt loader resembling the 886 model which bore the "Wollard" emblem and was fitted with a grip-strut running board — is insufficient to show which of several manufacturers who *could* have made the belt loader that allegedly caused Warnick's injury, actually *did* so.

This conclusion is reinforced by the facts and holding of *DeWeese v. Anchor Hocking,* 628 A.2d 421 (Pa. Super. 1993). In that case, a busboy was injured when a glass pitcher full of hot water exploded. He sued the manufacturer and seller who had supplied some — but not all — of the pitchers his employer used. *Id.* at 422. Significantly, DeWeese's employer used pitchers of various manufacturers; the identity of the manufacturer who actually made the pitcher that injured him could not be determined because DeWeese did not recall the type of the pitcher he was using, and because the broken shards of the one that exploded were discarded after the accident. *See id.* The Court of Common Pleas granted summary judgment to the defendants, and the Pennsylvania Superior Court affirmed, explaining that DeWeese's failure to identify the product at the time of the accident or preserve it for identification precluded him from meeting his burden of proving that "the injuries were caused by a product *of a particular manufacturer*." *Id.* at 423. As a later court would recognize, "*DeWeese* turned on the fact that plaintiff failed to produce any verified evidence whatsoever that defendants' products were the cause of plaintiff's injury — an essential element of a *prima facie* products liability case." *Dansak v. Cameron Coca-Cola Bottling Co., Inc.*, 703 A.2d 489, 491, 493-94 (Pa. Super. 1997). Other Pennsylvania courts have followed the *DeWeese* line of authority in factually analogous situations.[18]

18    *See, e.g., Stephens v. Paris Cleaners*, 885 A.2d 59, 65 (Pa. 2005) (affirming grant of summary judgment to two uniform manufacturers sued when plaintiff's work uniform caught fire and was completely incinerated; although both manufacturers supplied uniforms to plaintiff's employer and plaintiff ultimately claimed to have discovered the identity of the manufacturer in question by "viewing the uniform manufacturer's catalogs

22

Although Pennsylvania courts occasionally have distinguished *DeWeese*, they have done so when plaintiff offered evidence tending to show that a *particular* defendant made or sold the product.[19] Plaintiffs attempt to bring this case into line with those that have distinguished *DeWeese* by emphasizing that Warnick saw the "Wollard" emblem on the belt loader that injured him, which "resembled" the 886 model and had the grip-strut running boards characteristic of some loaders of that model. This evidence is insufficient to create a triable issue of material fact, however. The uncontroverted evidence establishes that 886 models bearing the "Wollard" emblem were made and sold by various manufacturers over two decades, so it is unclear which of those manufacturers made the particular belt loader on which Warnick injured his thumb. At most, Plaintiffs' partial identification evidence merely narrows the field of possible tortfeasors. Showing that a defendant's product was among several products which *could* have caused the injury is simply "too speculative to be submitted to a jury." *See Payton*, 710 A.2d at 1226. As *DeWeese* amply shows, Plaintiffs' evidence cannot carry their burden of proving causation.

---

and internet sites," he initially testified that he could not recall the manufacture of the uniform he was wearing on the day in question); *see also Payton*, 710 A.2d at 1226 (affirming grant of summary judgment to defendants where plaintiff was injured by a snapped chain sling but did not identify the manufacturer; although evidence showed that defendant bought chain slings from only one company, it was unclear whether the sling had been purchased by the defendant or by its predecessor company and there was no evidence as to who had supplied chain slings to that predecessor).

[19]     *See, e.g., Dansak*, 703 A.2d at 491 (reversing grant of summary judgment to defendants where, although the plaintiff injured on a broken soda bottle had not retained a broken bottle for inspection, she "never wavered in identifying the [bottle] as coming from a box containing Cameron's products"); *see also O'Donnell*, 696 A.2d at 850 (reversing summary judgment for defendants where, although a plaintiff whose pants caught fire could not remember the type of pants he was wearing, his wife's deposition testimony — which was that pants manufactured and sold by defendants were of "exactly the same make" as the ones plaintiff wore on the night in question — was sufficient evidence to sustain his burden of proving the identity of the manufacturer).

In light of the foregoing, Plaintiffs' contention that "[s]ince all belt loaders at the time of [P]laintiffs' injuries had the same defective design and since these defective belt loaders are still available for inspection, [D]efendants should not have any problem inspecting the defective designs and preparing a defense," (Pl. Opp. to NMC Mot. at 16), is beside the point. Here, Defendants do not complain that Plaintiffs failed to preserve the particular loader for inspection; instead, they contend that Warnick's failure to take sufficient note of its provenance at the time of the accident precludes Plaintiffs from establishing a genuine issue of material fact regarding its identity. Although retaining the belt loader would have been one way for Plaintiffs to determine who had manufactured it, it was certainly not the only way to do so. As Defendants point out, Plaintiff could have noted the US Airways identification number painted on the side of the loader. The courts which have held that spoliation does not prejudice defendants in design defect litigation have done so where there was some other evidence that a particular manufacturer made the allegedly defective product, or where the issue of the manufacturer's identity was not otherwise in dispute.[20]   Plaintiffs cannot bootstrap the legal principle that spoliation of the particular product generally does not prejudice defendants in design defect cases to absolve them of their burden of proving the identity of the particular manufacturer as part of their *prima facie* case.   *DeWeese* itself so held.[21]

---

[20]   *See Kerrigan v. Maxon Ind.,* 223 F. Supp.2d 626, 642 (E.D. Pa. 2002) (identity of the manufacturer of cement bowl agitator not in dispute); *see also Quaile v. Carol Cable Co.,* No. Civ. A. 90-7415, 1993 WL 53563, at *3 (E.D. Pa. Feb. 26, 1993) (no dispute that defendant manufactured lamp that injured plaintiff).

[21]   *See DeWeese,* 628 A.2d at 423 (noting that it was "persuade[d]" by the argument that Anchor Hocking was not prejudiced by the spoliation of the pitcher that exploded because it could inspect its other pitchers for the same design defect, but holding that "DeWeese's failure to preserve the pitcher is fatal in a much more fundamental respect — without the pitcher, there is simply no evidence tending to establish that the pitcher

24

The significance of the distinction between spoliation and causation is underscored by this Court's decision in *Lee v. Boyle-Midway Household Prods.*, 792 F. Supp. 1001 (W.D. Pa. 1992), a case which, when read at a moderate level of abstraction, is factually analogous to the situation presented here. In *Lee*, the plaintiff brought a strict liability claim for injuries he sustained while using two drain cleaners: one made by Zep and the other allegedly made by Boyle-Midway. *Id.* at 1004. Lee had lost the containers of both cleaners, which prompted the defendants to seek summary judgment for spoliation. *See id.* As to the Zep product, this Court found that although Lee had lost the container, other "sufficient evidence exist[ed] to confirm that the first drain cleaner plaintiff used was manufactured by Zep," and concluded that the "plaintiff's failure to produce the container of the drain cleaner he initially used in attempting to unclog his kitchen sink [was] immaterial." *Id.* As to the Boyle-Midway product, however, the Court reached a different result. The Court explained that although the plaintiff had insisted that "the product he used was Lewis Red Devil Lye Drain Cleaner," which Boyle-Midway manufactured, the "evidence of record conflict[ed] on that point." *Id.* at 1004. Although the Court acknowledged that spoliation would not prevent Boyle-Midway from testing its product for the alleged defect because any defect "presumably would be present in all cans" of Lewis Red Devil, *see id.* at 1006 at n.4, it explained that the loss of the product — combined with the inconsistent evidence as to the identity of the second product the plaintiff used — effectively precluded Boyle-Midway from arguing that the plaintiff's injuries were caused by some other product altogether:

---

involved in this case was manufactured [or sold] by [defendants].").

25

> The issue of whether [*sic*] the product plaintiff used was Lewis
> Red Devil Lye Drain Cleaner is, however, an issue to which Boyle-
> Midway must address itself whether or not the alleged defect is one
> affecting other cans. *Testing other containers of Lewis Red Devil
> will not suffice to help establish this defense.*

*See id.* (emphasis added). Accordingly, the court granted Boyle-Midway summary judgment. *Id.*
at 1006. As was true in *DeWeese* and *Lee,* here Plaintiffs have narrowed the field of

manufacturers who *could* have made the belt loader Warnick was using at the time of his

accident, but they have not produced enough evidence to permit a reasonable juror to reach a

principled inference that the product which *actually* caused his injuries was made by a particular

manufacturer.

In an effort to shore up their inability to prove causation, Plaintiffs argue that the legal

and contractual relationships between the Defendants operate to make them liable for damage

caused by *any* of the belt loaders, regardless of when and by whom they were made. Specifically,

Plaintiffs argue that the indeterminate provenance of the 886 model belt loader that Warnick was

using at the time of his accident is immaterial because Hobart is vicariously liable for products

Wollard made while it was Hobart's wholly-owned subsidiary, and because NMC is on the hook

for all 886 or 888 model belt loaders made at any time via successor-in-interest liability. But

aside from the fact that Plaintiffs have not pleaded vicarious liability against Hobart in their

Complaint,[22] and notwithstanding that Plaintiffs have failed to refute NMC's arguments that

---

[22]     *See* Hobart Reply to Pl. Opp. at 5 (citing Complaint at ¶6 to show that Plaintiffs only
pleaded direct or "successor-in-interest" liability). In *Computer Aid, Inc. v. Hewlett-
Packard Co.,* 56 F. Supp.2d 526, 537-38 (E.D. Pa. 1999), the defendant was granted
summary judgment on a claim for defamation, where the defendant could be liable only
under a theory of vicarious liability, but vicarious liability had not been pleaded in the
complaint. This is consistent with the general rule that "[p]laintiffs are not entitled to
raise a new theory of liability for the first time in opposition to a motion for summary

26

successor-in-interest liability is inapplicable in this case,[23] Plaintiffs have cited no authority for the proposition that these theories are a valid substitute for proof that a particular manufacturer caused Warnick's injuries. In short, because Plaintiffs cannot create a triable issue of material fact that *someone* is directly liable on the underlying tort claims, their assertions of vicarious liability and successor-in-interest liability are moot. *See, e.g.*, *Kraus v. Taylor* 710 A.2d 1142, 1147 (Pa. Super. 1998) (noting that, where the plaintiff could not show direct liability on his negligence claim, his assertion of vicarious liability was moot); *see also Daliessio v. Depuy, Inc.*, No. 96-CV-5295, 1998 WL 24330, at *5 (E.D. Pa. Jan. 23, 1998) (successor-in-interest liability inapplicable without showing that corporate predecessor was directly liable).[24]   Ultimately, to permit these claims to go to a jury would be to ask the trier of fact to do one of two things:  either

---

judgment." *Kaniuka v. Good Shepherd Home*, No. 05-CV-2917, 2006 WL 2380387, at *11 (E.D. Pa. Aug. 15, 2006) (citations omitted).

[23]   *See* NMC Reply to Hobart Opp. at 2-4 (explaining that the product-line exception to the general rule of no successor liability is inapplicable because Plaintiffs have a remedy against Illinois Tool Works, which retains responsibility for personal injuries caused by products made by WAEC); *see also* NMC Reply to Pl. Opp. at 5-6 (explaining that NMC is not a "continuation" of WAEC, whose factory was closed shortly after NMC purchased its assets).

[24]   A parent company normally is not liable for the obligations of its wholly-owned subsidiary, as Plaintiffs concede. Nevertheless, vicarious liability may be imposed where a parent corporation so dominates the activities of a subsidiary that it is necessary to treat the dominated corporation as an "alter ego" of the principal. *See Botwinick v. Credit Exch., Inc.,* 213 A.2d 349, 354 (Pa. 1965); *see also Garden State Tanning, Inc. v. Mitchell Mfg. Group, Inc.,* 55 F. Supp.2d 337, 344 (E.D. Pa. 1999) (explaining that "Pennsylvania requires a very high showing of domination and control in order to establish "alter-ego liability.'") (quoting *Jiffy Lube Int'l v. Jiffy Lube,* 848 F. Supp. 569, 580 (E.D. Pa. 1994)). Plaintiffs, however, cite *Brandimarti v. Caterpillar Tractor Co.,* 527 A.2d 134 (Pa. Super. 1987) for the proposition that a company's act of putting its own name on a product manufactured by another company is a factor which could be considered in the vicarious liability inquiry. Although Hobart apparently placed its name on the Wollard loaders it sold to US Airways, there is no evidence that one of those loaders was involved in Warnick's accident because Warnick only attested to seeing the name "Wollard," and *not* the name "Hobart."

27

guess whose product Warnick was using when he was injured, or apportion liability by
calculating the likelihood that either Defendants' belt loader actually caused Warnick's injuries.
But the jury may neither assign liability to a single defendant by guesswork,[25] nor spread liability
among multiple defendants according to the relative probability that their product was involved.[26]
Because Plaintiffs have not adduced sufficient evidence to establish the identity of the
manufacturer of the belt loader which allegedly injured Warnick, Defendants are entitled to
summary judgment.

## 3.   Plaintiffs Cannot Invoke Alternative Liability To Shift The Burden Of Proof Of Causation To Defendants

Plaintiffs admit that they "are unable to prove which manufacturer caused the harm" that
Warnick sustained. (*See* Pl. Opp. to Hobart Mot. at 27). At the same time, Plaintiffs seek to
avoid the implications of *DeWeese* and *Lee* by asserting that they should be permitted to shift the
burden to Defendants to *disprove* that their particular belt loader caused Warnick's injury
through the theory of alternative liability.

---

[25]     *See Marino v. Maytag Corp.,* No. Civ. A. 02-2085, 2005 WL 2403638, at \*4 (W.D. Pa. Sept. 29, 2005) (granting summary judgment in a design defect case where the plaintiff presented such sparse evidence on the issue of causation that "[t]he jury would have to speculate about the cause of the injury"); *see also Young v. Francis*, 832 F. Supp. 132, 137 (E.D. Pa. 1993) (granting summary judgment where "even if plaintiffs establish all of which they have shown they are capable, a jury would still be left to speculate — more probably to guess" as to the issue of causation).

[26]     Apportioning fault among multiple defendants by calculating the probability that a particular product was involved in an accident is, in essence, market-share or enterprise liability. But Pennsylvania courts are reluctant to apply market share liability, and the Court is confident that they would not do so in this situation. *See Skipworth v. Lead Indus. Assoc., Inc.*, 690 A.2d 169, 173-74 (Pa. 1997) (rejecting market-share liability in lead paint strict product liability cases); *see also Cummins v. Firestone Tire & Rubber Co.*, 495 A.2d 963 (Pa. Super. 1985) (declining to apply market-share liability to various tire manufacturers, when plaintiff injured when an unidentified tire exploded).

28

Alternative liability can shift the burden of proof on causation to the defendants "[w]here the conduct of two or more actors is tortious, and it is proved that harm has been caused to the plaintiff by only one of them, but there is uncertainty as to which one has caused it, the burden is upon each such actor to prove that he has not caused the harm." *See* Rest. (2d) of Torts, §433B(3) (1965). The Pennsylvania Supreme Court has adopted alternative liability as defined in Section 433B(3) of the Restatement of Torts. *See Snoparsky v. Baer,* 266 A.2d 707 (Pa. 1970). As the Third Circuit has cautioned, however, "[t]he Pennsylvania Supreme Court has approved alternative liability only when each defendant's tortious conduct was simultaneous and identical, and all potential tortfeasors were joined as defendants." *City of Philadelphia v. Lead Industries Ass'n, Inc.*, 994 F.2d 112, 128 (3d Cir. 1993). Notwithstanding the theoretical applicability of the doctrine, the Court finds that alternative liability is inapplicable to Plaintiffs' claims in the instant case for these reasons.

First, alternative liability only operates to shift the burden of proving causation when *multiple* torts are committed by *multiple* defendants. "Crucially, the conduct of two or more actors must be tortious for this concept, commonly called alternative liability, to apply. It cannot apply in a case like this where only one of the defendants committed a tort, even though the plaintiff does not know which one, and the others are blameless." *Mathai v. K-Mart Corp.*, No. Civ. A 05-1336, 2006 WL 166521, at *3 (E.D. Pa. Jan. 20, 2006). As Plaintiffs appear to concede when they argue that NMC and/or Hobart are liable for their damages, the alleged tort was committed by only one of the Defendants: whichever one made the belt loader Warnick used. Thus, although Plaintiffs suggest that both Defendants should be considered tortfeasors because the same allegedly-defective design is common to all of the belt loaders Defendants

29

made, the inescapable fact remains that no tort occurred until that allegedly-defective design

caused Plaintiffs' injuries. *See Sherk v. Daisy-Heddon*, 450 A.2d 615, 617 (Pa. 1982); *see also*

*Hammermill Paper Co. v. C.T. Main Const., Inc.*, 662 F. Supp. 816, 818 (W.D. Pa. 1987)

(explaining that, even if the defective design created a "threatened risk of harm" to people in the

vicinity, no cause of action for strict liability existed unless that defective product actually caused

injury to a plaintiff or his other property).[27]  In this case it is clear that *one* loader caused

Plaintiffs' alleged injuries. Thus, the doctrine of alternative liability is inapplicable to shift the

burden of proof.

Second, even if the Court were to find that Defendants' manufacture of belt loaders with

the same allegedly-defective design made them both tortfeasors, alternative liability would not

apply because it only shifts the burden of proof to "tortfeasors *who act in concert.*"  *Skipworth by*

*Williams v. Lead Industries Ass'n, Inc. (Skipworth II)*, 690 A.2d 169, 174 (Pa. 1997) (emphasis

added). Proof of concerted activity requires conduct that is "simultaneous and identical." *See*

*Skipworth by Williams v. Lead Industries Ass'n, Inc. (Skipworth I)*, 665 A.2d 1288, 292 (Pa.

Super. 1995) (declining to find the conduct "simultaneous and identical" where the defendants

---

[27]    This Court has observed previously that a design defect "tort occurs when [defendants]
participate in the commercial transfer of a defective product." *See Chelton v. Keystone
Oilfield Supp. Co.*, 777 F. Supp. 1252, 1258 (W.D. Pa. 1991) (citing *Webb. v. Zern*, 220
A.2d 853 (1966)). Under that logic, Plaintiffs could prove that Defendants were
tortfeasors simply by showing that the designs of their belt loaders were defective, even
though some of those belt loaders certainly were not responsible for Plaintiffs' injuries
and may not have injured anyone at all. The case that *Chelton* cites does not support that
sweeping proposition; instead, it confirms that a defendant has not committed a strict
liability tort unless the defective product causes a plaintiff "physical harm" or property
damage. *See Webb*, 220 A.2d at 854. Because *Chelton's* interpretation of Pennsylvania
law cannot be reconciled with the Pennsylvania Supreme Court's later explanation of the
burden of proof in *Pavlik v. Lane Ltd./Tobacco Exporters Int'l*, 135 F.3d 876, 881 (1998)
— which reiterates that proof of damages is an element of the tort — the Court declines
to follow *Chelton* on this point.

allegedly "made and sold various lead pigment products at different times throughout the 100-year period at issue."); *see also City of Philadelphia*, 994 F.2d at 128. Here, the uncontroverted evidence shows that Defendants made and sold belt loaders at different times over decades. This kind of conduct is not sufficiently "simultaneous" to justify application of the alternative liability burden-shifting mechanism.

Finally, the Court is mindful of the Restatement's admonition that alternative liability under Section 433B(3) requires not only that each defendant's tortious conduct be simultaneous and identical, but that all potential tortfeasors be joined as defendants. *See* Rest. (Second) of Torts, §433B(3), cmt. h; *see also City of Philadelphia*, 994 F.2d at 128. In the case at bar, it is clear that one of the two possible manufacturers of the 886 model is not before this Court. The evidence shows that the 886 model — the only model that Warnick testified was "similar to" the one that injured him — was manufactured from 1983 to 1994 with the grip-strut option by two companies: Criton-Wollard (from 1983 to 1987) and Hobart-Wollard (from 1987 to 1994). Thus, one of the two potential manufacturers of this belt loader — Criton, which had operated Criton-Wollard as a division rather than a subsidiary — is not before this Court although it could have made the belt loader that caused Warnick's thumb injury.

The foregoing analysis is bolstered by *Pennfield Corp. v. Meadow Valley Elec., Inc.*, 604 A.2d 1082 (Pa. Super. 1992), a case the parties did not cite. In *Pennfield*, a farmer brought a strict liability claim against a repair service when the failure of an electrical cable it installed at his farm caused the death of more than 1,500 swine; the repair service sought to join as defendants the only two companies who could have supplied him the defective cable. *See Pennfield*, 604 A.2d at 1082-83. Although the repair service had "narrowed the suppliers down

31

to two," it could not determine which one actually had supplied the cable at issue. *See Pennfield*, 604 A.2d at 1085 n.7. The Superior Court approved the Court of Common Pleas' refusal to apply alternative liability, explaining:

> We have not been able to verify the existence of what [the repair service] deems "the alternative liability exception to the identification rule." [The repair service] seems to believe "alternative liability" is applicable every time an injured party can narrow the possible tortfeasors down to a limited number of parties who could have potentially caused the injury. [But] "alternative liability" has little to do with identifying a potentially defective product.

*See id.* at 1085 n.8. Like the repair service in *Pennfield*, Plaintiffs in the instant case tacitly concede that they have done no more than narrow the field of potential tortfeasors — arguing that "the tortious design of the belt loader manufactured and sold by both NMC Wollard and/or Hobart Wollard" caused their injuries — but insist that alternative liability relieves them of their burden of showing which of the Defendants actually made the belt loader that injured Warnick. (*See* Pl. Opp. to Hobart Mot. at 27). The Court rejects this argument for the same reasons that the *Pennfield* court rejected it: it misconstrues the purpose of the theory of alternative liability, which is *not* to hale into court every defendant who *may* have committed a tort, but to force any defendant who *did* commit a tort to prove that the tort nevertheless *did not damage* the plaintiff.

In sum, the Court declines to apply the doctrine of alternative liability to shift the burden of proving causation from Plaintiffs to Defendants. As explained above, Plaintiffs' circumstantial evidence is insufficient to create a triable issue of fact as to the identity of the manufacturer who sold US Airways the belt loader that Warnick was using when he was injured. Accordingly, Defendants are entitled to summary judgment on Counts I and II, both of which

32

require proof of causation. Because Tamara's loss-of-consortium allegations are wholly

derivative of her husband's substantive allegations in Counts I and II, Defendants are entitled to

judgment as a matter of law on Count III as well. *See Parkinson v. Guidant Corp.,* 315 F.

Supp.2d 741, 753 (W.D. Pa. 2004) (observing that, under Pennsylvania law, "in order to recover

on a loss of consortium claim, [a] party must show [that a] defendant is liable to his or her

spouse") (citation omitted); *see also Szydlowski v. City of Philadelphia,* 134 F. Supp.2d 636, 639

(E.D. Pa. 2001) (same).

## VII.   Conclusion

For all the foregoing reasons, the Court concludes that Defendants have met their burden

of showing that their belt loaders are not unreasonably dangerous as a matter of law.

Additionally, Plaintiffs have not met their burden of proving which manufacturer's product was

the proximate cause of their injuries. The legal and contractual relationships between the

Defendants do not alter this conclusion, and Plaintiffs have not demonstrated that alternative

liability should shift the burden of proof on causation in this case. Thus, Defendants are entitled

to summary judgment against Plaintiffs and Defendants' cross-claims are moot.

An appropriate Order follows.

Thomas M. Hardiman

Thomas M. Hardiman
United States District Judge

Dated:   March 30, 2007

33